```
_____ :
                                :
JOHN DOE, individually and on   :
behalf of JANE DOE, a minor     :
child, all fictitious names,    :
                                :        Civil Action No.
                Plaintiffs,     :        10-cv-1338 (NLH)(AMD)
                                :
        v.                      :        OPINION
                                :
LEFTERIS BANOS, MICHAEL WILSON, :
ALAN FEGLEY, HADDONFIELD BOARD  :
OF EDUCATION, JOHN DOES (1-10)  :
(FICTITIOUS DEFENDANTS),        :
                                :
                Defendants.     :
_____ :
```

**APPEARANCES**:

MATTHEW S. WOLF
MELISSA A. SCHROEDER
MATTHEW S. WOLF, ESQ., LLC
1236 BRACE ROAD
2ND FLOOR, UNIT B
CHERRY HILL, NJ 08034
        *On behalf of plaintiffs*

JOSEPH F. BETLEY
KELLY ESTEVAM ADLER
CAPEHART & SCATCHARD, P.A.
LAUREL CORPORATE CENTER
SUITE 300
8000 MIDLANTIC DRIVE
MOUNT LAUREL, NJ 08054
        *On behalf of defendants*

**HILLMAN, District Judge**

Beginning in November 2006, and continuing at least through November 2009, in order for a student to participate in extra-curricular activities, such as a school-sponsored sports team,

the Haddonfield Board of Education ("HBOE") required the
student's parent to provide unqualified consent to a school
policy that precludes the child from any involvement with drugs
and alcohol, on or off school grounds.  The constitutionality of
this policy, known as the 24/7 Policy, has been challenged in
other proceedings before this Court and in the state court
system.[1]  This case does not challenge the legality of the Policy
itself, but instead concerns a parent's claim that the HBOE and
other Haddonfield officials[2] violated his First Amendment rights,

---

[1] On September 24, 2012, in a separate state administrative
proceeding that challenged the legality of the 24/7 Policy, the
Commissioner of Education found that the 24/7 Policy does not
comply with N.J.A.C. 6A:16-7.6 (providing, in part, that school
authorities have the right to impose a consequence on a student
for conduct away from school grounds only when it is reasonably
necessary for the student's physical or emotional safety,
security and well-being or for reasons relating to the safety,
security and well-being of other students, staff or school
grounds).  The Commissioner ordered the HBOE to revise the Policy
to bring it into compliance with that regulation.  (Pl. Ex. A,
Docket Entry 63-7, Copy of Decision in *M.W., on behalf of minor
child, C.W. v. Board of Education of the Borough of Haddonfield,
Camden County*, OAL DKT. NO. EDU 0594-11.)  In a state court case
between M.W. and the HBOE that challenges the constitutionality
of the 24/7 Policy, see *M.W., on behalf of minor child, C.W. v.
Board of Education of the Borough of Haddonfield*, Docket No. A-
001036-12T3, the HBOE continues at the appellate level to dispute
M.W.'s claims.  (See *D.O. v. Haddonfield Board of Education*,
D.N.J. 10-cv-631, Docket Entry 146.)  The D.O. matter filed
before this Court has been stayed pending the outcome of the *M.W.*
matter in state court.  (See *D.O. v. Haddonfield Board of
Education*, D.N.J. 10-cv-631, Docket Entry 143.)

[2] Defendants Lefteris Banos is the athletic director of the
Haddonfield Memorial High School; Michael Wilson is the principal
of the Haddonfield Memorial High School; and Alan Fegley is the
superintendent of the Haddonfield School District.

and committed negligence, when his expression of his disagreement with the Policy led to his daughter being precluded from playing lacrosse.

At the start of this case, which was filed in March 2010, the Court considered the application of the parent, plaintiff, John Doe, individually and on behalf of his then fifteen-year old daughter, Jane Doe, for preliminary restraints, which sought to compel defendants to allow Jane Doe to play on the school's lacrosse team. The Court denied plaintiff's motion, finding that plaintiff did not meet the elements of Federal Rule of Civil Procedure 65, which empowers district courts to grant preliminary injunctions, particularly with regard to plaintiff's success on the merits of his First Amendment violation claim. The Court concluded that plaintiff failed to demonstrate that defendants' conduct suppressed, impeded, or compelled any constitutionally protected speech.[3] (Docket No. 20 at 17-18.)

Since that time, the parties engaged in the discovery process. Defendants have now moved for summary judgment in their favor on plaintiff's First Amendment and negligence claims. They argue that no genuine disputed facts exist to send to a jury to consider whether plaintiff's rights were violated, and that plaintiff's claims fail for substantively the same reasons as

---

[3] Plaintiff appealed that decision to the Third Circuit Court of Appeals pursuant to Third Circuit LAR 34.1(a). The Third Circuit affirmed this Court's Order. (Docket No. 50.)

they did at the preliminary injunction stage of the case. Plaintiff has opposed defendants' motion, contending that material disputed facts abound, and that a jury must resolve his First Amendment claim.[4]  Plaintiff has also cross-moved to strike defendants' affirmative defenses in their answer to plaintiff's complaint.

For the reasons expressed below, defendants' motion will be granted, and plaintiff's motion will be denied as moot.

## I.    JURISDICTION

Plaintiff has brought a federal constitutional claim pursuant to 42 U.S.C. § 1983, as well a negligence claim under New Jersey law.  This Court has jurisdiction over plaintiff's federal claim under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over plaintiff's state law claim under 28 U.S.C. § 1367.

## II.  BACKGROUND

The following background facts were set forth in the Court's April 26, 2010 Opinion resolving plaintiff's motion for temporary restraints.  Any facts supplemented by the discovery process will be discussed in the analysis of plaintiff's First Amendment claim.

In November 2006, the HBOE adopted a policy addressing the

---

[4] Plaintiff does not oppose the entry of judgment in defendants' favor on his negligence claim.

use of drugs and alcohol by middle and high school students
outside of school and unrelated to any school-sponsored
activities.  The Policy, referred to as the "24/7 Policy,"
prohibits students from consuming, possessing, or distributing
drugs or alcohol, or attending any gatherings or activities where
the presence of drugs or alcohol is reasonably likely to occur.
For those students who violate it, the Policy mandates
punishments, depending on the number of offenses, which may
include suspension from extracurricular activities or the
imposition of counseling or community service.

     To effectuate the Policy, parents and students are required
to sign a "Student Activities Permission Form" ("permission form"
or "form").[5]  Only by the parent and the student signing the form
may the student then participate in an extracurricular activity.
Relevant for purposes of this case, when a student signs the
form, he or she affirms:

          I understand conduct regulations prohibit the
          use of tobacco in any form, drinking,
          possessing or providing alcoholic beverages
          and/or use, possession, or providing illegal
          drugs including anabolic steroids, at any
          time.  The violation of these regulations
          will be dealt according to the Haddonfield

----

          [5] The parties refer to this form as a "consent form."  The
     form itself does not expressly ask for consent but is rather
     couched in terms of notice or an acknowledgment of the
     applicability of certain policies.  A careful reading of the
     Policy itself, however, which the parent signer of the form
     acknowledges as having read, shows that the Policy deems the
     parent's signature as consent to its terms.

> Board of Education Drug and Alcohol Policies
> (consequences of 24/7 Drug and Alcohol Policy
> Concerning Student Conduct at Non-School
> Related Events enclosed).

When a parent signs the form, he or she affirms: "I have received and read all the information regarding student participation in the interscholastic/co-curricular activities. I have also reviewed the HSD Alcohol & Drug Regulations." Correspondingly, a section of the Policy stipulates:

> All student participants in all
> extracurricular activities are to be made
> aware of the appropriate level of this policy
> and, as a condition of participation, each
> student in the Middle School and High School
> who participates in extracurricular
> activities and submits the necessary
> paperwork for participation in such
> activities in connection with the student
> activity fee or other requirements, shall be
> deemed to agree to conform to this policy.
> <u>Similarly, the parent or guardian signature
> which accompanies the paperwork for
> participation in extracurricular activities
> will reflect the parent's/guardian's consent
> as well</u>.

(Emphasis added).

In December 2009, Jane Doe and her family filed a verified complaint in the Superior Court of New Jersey, challenging the validity of the Policy and seeking preliminary and permanent injunctions against it, among other relief.

While the litigation ensued, on January 29, 2010, John Doe submitted a permission form allowing Jane Doe to play lacrosse. On the form, however, John Doe had scratched out the portion of

the form informing Jane Doe that she would be subject to the Policy if she violates conduct regulations prohibiting drug or alcohol use.  John Doe was told by one of the defendants that the form, as modified, would not be accepted.

On February 5, 2010, the Superior Court dismissed the Does' complaint and application for temporary restraints, and directed them to pursue their claims before the New Jersey Commissioner of Education.  Within a week or so, the Does filed their case before the Commissioner and sought injunctive relief.

Moreover, in response to the school's refusal to accept the altered permission form, John Doe signed and submitted another form on February 24, 2010.  This time, he attached to the form a cover letter in which he explained, in part:  "You said that [Jane Doe] cannot play lacrosse unless the Student Activities Permission Form is filled out without alterations.  I have enclosed a new form filled out without alterations.  I believe the 24/7 Policy is illegal and unenforceable but have filled out the form under duress."

Upon defendants' receipt of the form and the letter, a series of communications transpired between counsel for both parties.  On February 25, 2010, defendants' counsel e-mailed John Doe's counsel, expressing concern over the use of the term "duress" and the possibility that its inclusion could render the permission form unenforceable.  Defendants' counsel suggested

that the phrase, "reservation of rights," would not have the same legal effect and would enable both parties to later assert their positions with respect to the Policy and the enforceability of the form. Two days later, John Doe's counsel replied, in an e-mail, that defendants were coercing John Doe to sign the form, and that "[m]y clients won't agree to be bound to a policy they believe to be illegal." Finally, on March 5, 2010, defendants' counsel sent John Doe a letter explaining that the form he signed "under duress" was "invalid and unacceptable," and that Jane Doe would not be permitted to play lacrosse unless John Doe "either unconditionally sign[ed] a new permission form," "rescind[ed] in writing [the] February 23, 2010 statement regarding signing the form under duress," or "amend[ed the] correspondence to indicate 'with full reservation of rights.'"

On March 12, 2010, John Doe filed a complaint in this Court, alleging that by refusing to accept his previously submitted permission form, including the cover letter indicating that he signed the form "under duress," defendants violated his First Amendment right to free speech. John Doe also alleges that defendants' conduct breaches their duty of care owed and, thus, constitutes negligence.

Days after John Doe instituted his suit in this Court, an administrative law judge rejected the Does' arguments against the

Policy and denied their request for emergency relief.[6]  John Doe
subsequently moved before this Court, on March 18, 2010, for a
preliminary injunction to enjoin defendants from excluding Jane
Doe from the school's lacrosse team.  The Court heard oral
arguments relating to the motion on April 20, 2010.  On April 26,
2010, the Court issued an Opinion supplementing the Court's oral
ruling denying John Doe's application.

## III. DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied
that the materials in the record, including depositions,
documents, electronically stored information, affidavits or
declarations, stipulations, admissions, or interrogatory answers,
demonstrate that there is no genuine issue as to any material
fact and that the moving party is entitled to a judgment as a
matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330
(1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing

---

[6] In a letter to the Commissioner of Education, dated March
25, 2010, the Does' counsel explained that plaintiffs had filed
an appeal of the Superior Court's earlier decision in the case to
the Appellate Division of New Jersey, and that they were
withdrawing their case from the Commissioner.

substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  <u>Marino v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Id.</u>  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**B.  First Amendment Claim**

Plaintiff argues that defendants' refusal to accept the signed, unaltered permission form accompanied by his letter stating that he signed the form "under duress" constitutes a

violation of plaintiff's First Amendment rights to express his opinion and to protest and object to a governmental policy. Plaintiff also contends that defendants' insistence that he sign the form, and their suggestion that he replace the words "under duress" with a "full reservation of rights," are impermissible examples of compelled speech. Additionally, plaintiff argues that defendants' refusal to accept the permission form and his daughter's exclusion from the lacrosse team were improper forms of retaliation for his filing of the lawsuits against defendants and for his expression of his opinion regarding the legality of the 24/7 Policy.

Defendants counter that their refusal to accept plaintiff's signed permission form accompanied by his letter stating that he signed it "under duress" had nothing to do with any disapproval they may harbor toward his criticism of the Policy. Rather, defendants contend that they did not accept his permission form, and, consequently, would not allow Jane Doe to play lacrosse, because plaintiff's inscription of the legal term of art, "under duress," would, in essence, invalidate and nullify the consent he was supposedly granting by signing the form. Apart from any legal consequence that plaintiff's adoption of "under duress" may have on his consent, defendants argue that they did not attempt curtail or manipulate his speech. Defendants contend that their focus on plaintiff's cover letter and the expression "under

duress" was the result of advice from their legal counsel.
Moreover, defendants argue that plaintiff has produced no
evidence to show that they did not act in good faith.  Because
they did not attempt to interfere with plaintiff's protected
speech, and their conduct was done in good faith, defendants
argue that no material facts exist to dispute that they did not
violate his First Amendment rights.

Plaintiff asserts his constitutional claim pursuant to 42
U.S.C. § 1983.[7]  To state a claim under Section 1983, a plaintiff
must show that: (1) the conduct challenged was committed by a
person acting under color of state law; and (2) that the conduct
deprived him of his rights, privileges, or immunities secured by
the Constitution or laws of the United States.  See Shuman ex
rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d
Cir. 2005).  Plaintiff claims that defendants violated the First
Amendment to the United States Constitution.  In relevant part,

_____

[7] Section 1983 provides:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State . . . subjects, or causes to be
> subjected, any citizen of the United States or
> other person within the jurisdiction thereof
> to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and
> laws, shall be liable to the party injured in
> an action at law, suit in equity, or other
> proper proceeding for redress . . . .

42 U.S.C. § 1983.

the First Amendment proclaims:  "Congress shall make no law . . .

abridging the freedom of speech."  It guarantees "both the right

to speak freely and the right to refrain from speaking at all."

Wooley v. Maynard, 430 U.S. 705, 714 (1977).

In order to prove a First Amendment retaliation claim, a

plaintiff must demonstrate two things: (1) that the activity in

question is protected by the First Amendment, and (2) that the

protected activity was a substantial factor in the alleged

retaliatory action.  Hill v. Borough of Kutztown, 455 F.3d 225,

241 (3d Cir. 2006) (citation omitted).  The first factor is a

question of law; the second factor is a question of fact.  Id.

(citing Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir.

2004)).

When the Court considered plaintiff's First Amendment claim

in the preliminary injunction context, the Court found:

> Notwithstanding the constitutional proscriptions
> against censoring or coercing speech, defendants'
> conduct in this case does not offend the First
> Amendment or its guarantees and values.  Defendants'
> refusal to accept the permission form from John Doe --
> and to allow Jane Doe to play on the lacrosse team --
> was not intended to chill, squelch, or compel speech,
> nor did it have any of those practical effects.
> Rather, defendants' request for John Doe's signature on
> the permission form, and his unequivocal consent to the
> 24/7 Policy, was merely a reasonable effort to enforce
> the Policy uniformly as it applies to student-athletes.
> Barring Jane Doe from playing lacrosse was not imposed
> by defendants as a punishment for or a deterrent to
> John Doe's dissent to the Policy.  Not allowing Jane
> Doe to play was simply a consequence of the Policy's
> mandates, which require parental consent from all
> student-athletes on the lacrosse team.

Here, defendants were entitled to ask of John Doe the same thing they asked of all other parents -- a legally valid permission form.  Stated differently, the HBOE's conduct was designed not so much to compel or deter the father's <u>speech</u> as it was to elicit oral affirmation that his daughter's <u>conduct</u> would not violate the laws against drug use and underage drinking and that she would willingly join in a collective agreement with her teammates to remain drug and alcohol free during lacrosse season.[8]

As is made clear from the evidence presented to this Court, John Doe had and was continuously offered every opportunity to exercise his constitutional right to free speech.  Defendants did not object to his criticism or disapproval of the Policy in his letter appended to the permission form, even when he characterized the Policy as "illegal and unenforceable."  Nor did defendants attempt to quell John Doe's opposition, offering him the option of qualifying his signature with "full reservation of rights."  Instead, defendants' only concern was the possible legal ramifications of designating his signature as being written "under duress."  Insofar as defendants have the right to predicate a student's participation and involvement in extracurricular activities on a parent's consent to the enforcement of a reasonable drug and alcohol policy, the Court cannot conclude that defendants abridged John Doe's First Amendment rights even if it precluded his daughter from playing lacrosse.

A school's insistence on parental consent to allow children to participate in extracurricular activities is not the type of activity that violates the First Amendment or invites heightened judicial scrutiny.  To

---

[8] In that way, this case is distinguishable from those cases analyzing conduct that contains both speech and non-speech elements.  <u>See, e.g.</u>, <u>United States v. O'Brien</u>, 391 U.S. 367 (1968) (upholding conviction for burning draft card in light of substantial governmental interest in suppressing non-communicative conduct).  Here, the speech and conduct are separated.  The HBOE does not seek to regulate the father's speech; its paramount concern is regulating the daughter's non-protected conduct.

> the extent that the inclusion of the phrase, "under
> duress," may invalidate that consent, defendants'
> actions do not infringe any protected speech or other
> constitutional right.

(April 26, 2010 Opinion, at 12-14.)

In his opposition to defendants' motion for summary judgment, plaintiff argues that despite the Court's decision on its motion for preliminary restraints, the evidenced gathered through discovery requires that a jury must now decide whether his daughter's exclusion from the lacrosse team was a result of his expression of his First Amendment-protected view on the 24/7 Policy, rather than defendants' proffered reason that they believed, through advice of legal counsel, that plaintiff's use of "under duress" in the cover letter attached to the otherwise unadulterated, signed consent form effectively negated his signed consent.

To support his position that a jury must consider this question, plaintiff points to the deposition of Dr. Fegley, the Haddonfield School District Superintendent, who plaintiff claims testified that he, the school board, the principal, and staff made the decisions on how to operate the school district, and not legal counsel to the school district. Plaintiff also claims that Dr. Fegley testified that he did not understand that the use of the term "under duress" was objectionable, and that he did not believe that the letter accompanying the permission form was in violation of any rule or regulation. Based on this testimony,

15

plaintiff contends that a reasonable jury could conclude that the school district acted in retaliation of plaintiff's expression of his constitutionally protected speech, rather than based on the legal implications of the use of the term "under duress" pursuant to the advice of counsel.

Plaintiff's argument is unavailing, and the use of Dr. Fegley's parsed-out testimony is misleading. Although Dr. Fegley testified that he did not have any independent knowledge of the legal effects of the use of the term "duress" on the permission form, and he also testified that he and the school board and school staff, and not the district's legal counsel, were the ultimate decision-makers in determining whether Jane Doe could participate in lacrosse, Dr. Fegley also testified that his decisions were all counseled by the school district's attorney.

When asked, "So [the school district's attorney] doesn't make decisions for the district. He gives advice, correct?," Dr. Fegley answered, "That is correct. Generally it is poor practice not to follow your solicitor's advice." Dr. Fegley continued, "I will say I made the decision . . . by directing Mr. Banos that it had to be a properly signed form as directed by -- as received from the solicitor, the solicitor's advice."[9] (Def. Ex. 5, Dep.

_____

[9]This line of questioning was in the context of the adulterated permission form submitted by another student, C.W., who is not the plaintiff in this case. The Court therefore questions how Dr. Fegley's testimony on the decision concerning another parent's compliance with the 24/7 Policy is relevant to

of Dr. Fegley, at 54-55.)

Dr. Fegley was then asked about plaintiff's letter that contained the "under duress" language, specifically as to what Dr. Fegley found objectionable about the word "duress." Dr. Fegley answered, "Within that sentence there was also, as you indicated, and I don't remember the specific word order, that it was legal, unenforceable, but I signed this under duress. When I receive something that is a standardized form that has been changed or altered, I need to understand the implications, legal implications. It was brought to my attention, and, therefore, I contacted the attorney, district solicitor for advice." Next, Dr. Fegley was asked:

> Q. Other than what you were told by counsel, do you have a personal view of what is objectionable about the language that was on the letter that accompanied the permission form?
>
> A. No.
>
> Q. So you don't have an independent understanding of why that letter or its content was objectionable?
>
> A. That is correct. When making the call, that is correct.
>
> Q. And so your decision was based solely on advice of counsel?
>
> A. Yes.

---

plaintiff's claim that the school district retaliated against him for his own conduct, which is different from that of C.W.'s. The Court only addresses this testimony because of plaintiff's argument that it supports the denial of summary judgment.

Q. Just to be clear, other than what you may
have been told by counsel, do you have an
understanding as to whether the letter submitted
with the permission form violated any rule or
regulation in your mind?

A.  If I understand your question properly, you
are asking me did I make a decision based on
anything else other than the advice of counsel on
that, in that return letter, and the answer is no?

Q.  Did the letter that accompanied that
permission form violate any rule or regulation that you
are aware of?

A.  Not that I'm aware of.

(Def. Ex. 5, Dep. of Dr. Fegley, at 56-57.)

In two, unequivocal statements, Dr. Fegley testified that his decision to disallow Jane Doe from playing lacrosse was based solely on the advice of the school district's legal counsel. Although it is typically for a jury to assess the credibility of a defendant's testimony, and in deciding a motion for summary judgment, the Court must make all credibility decisions in the non-movant's favor, plaintiff has not provided any evidence to contradict Dr. Fegley's testimony or cast his testimony in a light more favorable to plaintiff.[10]  Plaintiff believes that

---

[10]Plaintiff argues that defendants cannot be permitted to claim that their decision to preclude Jane Doe from playing lacrosse was pursuant to the advice of their legal counsel, while at the same time not revealing the content of that legal advice. There is authority for the proposition that a defendant can waive the attorney-client privilege by asserting defenses that put his attorney's advice in issue in the litigation.  Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994). When this is the case, a plaintiff may pursue discovery pertaining to those attorney-client communications.  See Fahs

defendants wanted to chill his opposition to the 24/7 Policy, and
that they retaliated against him for his views.[11]  Plaintiff,
however, has not produced any evidence, other than his beliefs,
to support his claim.  Plaintiff must come forward with more than
his own unsupported beliefs to defeat a motion for summary
judgment.  See Liberty Lobby, 477 U.S. at 256-57 (noting that the
plaintiff must come forward with affirmative evidence).

Moreover, plaintiff has not provided any evidence to refute
defendants' position that they were acting in good faith on the

---

Rolston Paving Corp. v. Pennington Properties Development Corp.,
Inc., 2006 WL 3827427, 4 (D.N.J. 2006) (quoting In re Kozlov, 79
N.J. 232, 243-44 (1979)) ("[T]hree foundations must be
established by the party seeking to pierce the privilege:(1)
there must be a legitimate need for the evidence; (2) the
evidence must be relevant and material to the issue before the
court; and (3) by a fair preponderance of the evidence, the party
must show that the information cannot be secured from any less
intrusive source.").  As defendants point out, however, plaintiff
never sought such information in the long discovery process,
despite it being clear, at least as of January 6, 2012 during Dr.
Fegley's deposition, that the decisions made on how to handle
parents' oppositions to the 24/7 Policy were based on advice from
legal counsel.  (See, e.g., Def. Ex. 5, Dep. of Dr. Fegley, at
52-53.)


[11]"[T]he key question in determining whether a cognizable
First Amendment claim has been stated is whether'the alleged
retaliatory conduct was sufficient to deter a person of ordinary
firmness from exercising his First Amendment rights.'"  Thomas v.
Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006) (quoting
McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (other citations
omitted).  In addition to not proving that plaintiff's expression
of his views on the 24/7 Policy caused defendants to preclude
Jane Doe from lacrosse, plaintiff has not demonstrated that
defendants' conduct deterred him from continuing to express his
opposition to the 24/7 Policy.

advice of counsel.[12]  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, n.

---

[12]Plaintiff has moved to strike defendants' affirmative
defenses because defendants did not provide any discovery on
those defenses.  Plaintiff, however, does not specify what
affirmative defenses defendants pleaded, and plaintiff does not
explain which affirmative defenses should be stricken, other than
their "good faith" defense.  With regard to defendants' "good
faith" defense, plaintiff asks that it be stricken because facts
supporting that defense were not provided to plaintiff prior to
Dr. Fegley's deposition.  Plaintiff argues that the use of this
defense at the summary judgment stage is an unfair surprise.
    Plaintiff's argument is disingenuous for several reasons.
First, the "good faith" defense is listed as defendants' Ninth
Separate Defense.  (Defendants' Answer at 5.)  Second, the
analogous qualified immunity defense is listed as their
Thirteenth Separate Defense.  (<u>Id.</u>)  Third, when bringing a claim
pursuant to 42 U.S.C. § 1983 against a public entity and public
officials, it should be anticipated that the qualified immunity
defense will be advanced by the defendants, particularly because
a court is required to consider it as soon as possible in the
case, and because a decision denying qualified immunity is
immediately appealable.  <u>See</u> <u>Thomas v. Independence Twp.</u>, 463
F.3d 285, 291 (3d Cir. 2006) (citations and quotations omitted)
(explaining that (1) because qualified immunity bestows immunity
from suit, the Supreme Court repeatedly has stressed the
importance of resolving immunity questions at the earliest
possible stage in litigation; (2) the Supreme Court has
admonished that until this threshold immunity question is
resolved, discovery should not be allowed; and (3) unless the
plaintiff's allegations state a claim of violation of clearly
established law, a defendant pleading qualified immunity is
entitled to dismissal before the commencement of discovery).
    Fourth, even though the burden of pleading and establishing
qualified immunity rests on the defendants, the defense of
qualified immunity is not necessarily waived by a defendant who
fails to raise it until the summary judgment stage.  <u>Eddy v.
Virgin Islands Water and Power Auth.</u>, 256 F.3d 204, 210 (3d Cir.
2001).  Fifth, plaintiff was put on notice as to all of
defendants' affirmative defenses as they were pleaded in their
Answer, and plaintiff could have filed motions with the
magistrate judge relating to those defenses.  <u>See</u> Fed. R. Civ. P.
26(b)(1) ("Parties may obtain discovery regarding any non-
privileged matter that is relevant to any party's claim or
defense--including the existence, description, nature, custody,
condition, and location of any documents or other tangible things
and the identity and location of persons who know of any

24 (1982) (explaining that it must be proven that defendants knew or reasonably should have known that the actions they took within their sphere of official responsibility would violate the constitutional rights of plaintiff, or that they took the action with the malicious intention to cause a deprivation of constitutional rights), quoted in Williams v. New Jersey Div. of State Police, 2012 WL 1900602, 13 (D.N.J. 2012) (explaining that qualified immunity relies on the notion of good faith, and is an affirmative defense in actions pleaded under the Constitution and laws of the United States, including § 1983); see also Ginter v.

---

discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). And, finally, the burden of proving all affirmative defenses rest with the defendants, and any failure to provide evidence to support such defenses would be fatal to the viability of those defenses, which would only serve to harm defendants. In other words, should defendants have sought to use an affirmative defense that was not properly supported, only then could the plaintiff seek to bar defendants' use of that defense. See Tonka Corp. v. Rose Art Industries, Inc., 836 F. Supp. 200, 218 (D.N.J. 1993) (citation omitted) ("An affirmative defense can be stricken only if the defense asserted could not possibly prevent recovery under any pleaded or inferable set of facts.").

The only affirmative defense used by defendants at this stage in the case is the good faith/qualified immunity defense, of which plaintiff had notice since April 6, 2010, and which has been supported by evidence properly gathered and shared through the discovery process. Regardless, however, of defendants' ability to establish their good faith defense, it is ultimately unnecessary because the Court has found that plaintiff cannot prove his First Amendment retaliation claim, which is a prerequisite to the qualified immunity analysis. Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (explaining that either question of the qualified immunity analysis can be considered first).

Skahill, 298 Fed. Appx. 161, 165 (3d Cir. 2008) (citations omitted) (explaining that (1) qualified immunity protects government officials from liability if their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known," (2) even if a constitutional right was violated, the officer is still entitled to qualified immunity if "the officer's mistake as to what the law requires is reasonable," and (3) qualified immunity is determined under a standard of objective reasonableness); id. (finding that because a police officer spoke with an Assistant District Attorney before filing his affidavit for the plaintiff's warrant, he was deliberate in acting in accordance with the law, and from an objective view, his actions corresponded with the legal advice he received from the Assistant District Attorney, which afforded the police officer qualified immunity).

Thus, even accepting as a matter of law that plaintiff's expression of his views on the 24/7 Policy constitutes speech protected by the First Amendment, plaintiff has not provided any disputed material facts to (1) cast doubt on the school district's legitimate reason for disallowing his daughter to play lacrosse, or (2) refute defendants' evidence that they acted in good faith.

As the Court articulated in its prior Opinion, restated above, the First Amendment fostered plaintiff's right to express

his views on the propriety of the 24/7 Policy, and plaintiff did so in several ways.  Plaintiff, however, has not been able to show that the school district defendants retaliated against him because of his expression of his beliefs.  Consequently, summary judgment must be entered in defendants' favor.

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be granted, and plaintiff's motion to strike defendants' affirmative defenses will be denied as moot.  An Order consistent with this Opinion will be entered.


Date: August 19, 2013          s/ Noel L. Hillman
Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.